# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JONATHAN MCCRAVEY,       )
                           )
           Petitioner,    )
                           )
         v.           )     1:11CV342
                           )
ALVIN W. KELLER,        )
                           )
           Respondent.   )

## MEMORANDUM OPINION AND ORDER

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 4.) On July 23, 2008, in the Superior Court of Forsyth County, a jury found Petitioner guilty of assault inflicting serious injury, false imprisonment, and second-degree rape in case 07CRS20705 and the trial court thereafter imposed consecutive prison sentences of 45 days for the false imprisonment offense, 75 days for the assault inflicting serious injury offense, and 100 to 129 months (followed by satellite based monitoring ("SBM") for life) for the second-degree rape offense. (Id., ¶¶ 1-6; Docket Entry 4-2 at 30-31, 34-41, 46-47; Docket Entry 9-10 at 8-19; Docket Entry 9-11 at 2-11.)[1] Petitioner unsuccessfully pursued a direct appeal, State v. McCravey, 203 N.C. App. 627, 692 S.E.2d 409,

---

[1] Attachments to the Petition (which include trial court and direct appeal documents) appear at Docket Entries 4-1, 4-2, and 4-3. The transcript of trial court proceedings appears at Docket Entries 9-5 through 9-11. Pin cites to all of the foregoing materials refer to the page number(s) in the footer appended to said materials upon their docketing in the Court's CM/ECF system. The above-cited portions of those materials reflect that the second-degree rape judgment entered on July 23, 2008, did not include SBM; however, an amended judgment entered the next day added SBM after a hearing on that issue. (See Docket Entry 4-2 at 34-37, 46-47; Docket Entry 9-10 at 8-19; Docket Entry 9-11 at 2-11.)

<u>review denied</u>, 364 N.C. 438, 702 S.E.2d 506 (2010), but sought no collateral review in the state courts before instituting this action (<u>see</u> Docket Entry 4, ¶ 10). Respondent has moved for summary judgment (Docket Entry 7) and Petitioner has responded (Docket Entry 10). The parties consented to disposition of the case by a United States Magistrate Judge. (Docket Entry 12.) For the reasons that follow, the Court will grant Respondent's instant Motion and will deny the Petition.

## I. Claims

The Petition lists two grounds for relief. First, the Petition asserts that "the [t]rial court erred by given [sic] its opion [sic] that the alleged [d]rug use of the [victim] was not [r]elevant." (Docket Entry 4, ¶ 12(Ground One).) Second, the Petition alleges that Petitioner "was put in Double jepordy [sic] by the term 'use of force or threat of serious violence,' [f]or a consential [sic] [a]ct, and sentence [sic] to [an] unconstitutional [l]ifetime SBM statute." (<u>Id.</u>, ¶ 12(Ground Two).)

## II. Facts

The North Carolina Court of Appeals summarized the facts as follows:

> The State's evidence tended to show that Tiffany McCravey ("Tiffany") and [Petitioner] were married in 2000, but had separated and reconciled at least four or five times. On 24 October 2007, [Petitioner] and Tiffany were not living together. Tiffany was living with her six-year-old son Mike in a house co-owned with [Petitioner]. However, because [Petitioner] had been threatening her and "had been using drugs for a while," Tiffany was afraid that [Petitioner] would hurt her, and Tiffany's sister had been staying with her "just for security." Tiffany had not changed the locks on the

doors but had barricaded them. On the night of 24 October 2007, Tiffany's sister was not present in the home, so Tiffany and her son were the only ones in the house. Around midnight, Tiffany heard a noise and immediately got out of bed. As Tiffany turned the hallway lights on, [Petitioner] was walking up the steps from the foyer into the hallway towards the bedroom. Tiffany immediately told [Petitioner] that he was not supposed to be there and that he needed to leave. [Petitioner] told her that he was not leaving and started hitting Tiffany with his hands, first around her head, then all over her body. Tiffany fell down but got back up. Tiffany stated that "he looked as if he had been, you know, smoking or drinking or high" and she had "never seen him so angry and so violent and so upset." Tiffany testified that [Petitioner] was "ranting and raving about someone else being in the house." [Petitioner] asked her if there was another man in the house and went downstairs to search the house. [Petitioner] then dragged Tiffany down the hallway to the bedroom. Tiffany managed to get away and ran downstairs to the door but [Petitioner] jumped from the top of the stairs and caught her, saying "Bitch, you're not going anywhere," and he hit her. [Petitioner] then grabbed Tiffany by the hair and began dragging her back upstairs to the bedroom. Tiffany testified that "at that time, I felt like I really needed to cooperate because he was just really—I mean, just—I had never seen him like that, like I mentioned before. At that time, he told me, he said, 'Bitch, I ought to kill you.'" [Petitioner] then went downstairs and returned with a steak knife. With "the knife in his hand," [Petitioner] said, "Bitch, I ought to cut your fucking throat." [Petitioner] then ordered Tiffany into the master bathroom and went to their son Mike's bedroom to ask him about "mommy's boyfriend." [Petitioner] returned to the bathroom and dragged Tiffany by the hair into the bedroom and sat her on the bed. [Petitioner] placed the knife on the night stand, then "rolled two joints," put a sex movie in the DVD player and turned the television on. [Petitioner] continued hitting Tiffany, asking her "Was this nigger worth it?" and was he worth "getting your ass beat?" [Petitioner] told Tiffany to take off her gown and underwear. Tiffany testified that at this point:

> I felt like I needed to do whatever he told me to do. I felt like inside it had to end, but I didn't know how it was going to end. I just wanted to be alive when it did. And I decided in the

bathroom, whatever he asked me to do, I
        was going to do it.

[Petitioner] then told Tiffany, "Bitch, you're going to
give me some pussy." Tiffany told him that she did not
want to have sex, as she was "really in pain," her lip
was bleeding, her eye was swollen, and her son was upset.
However, [Petitioner] told her "Yes, you are." Tiffany
stated that she "didn't know if [Petitioner] was going to
flip out and go in the room and try to hurt Mike, so her
whole thing was to try to keep him in the bedroom with
her in terms of, you know, just cooperate." Tiffany then
took off her gown and underwear. [Petitioner] ordered
Tiffany on the bed and proceeded to perform oral sex on
Tiffany. [Petitioner] then ordered Tiffany to perform
oral sex on him and she did. Tiffany testified that
[Petitioner] then "put his penis in my vagina." When
[Petitioner] had finished, Tiffany asked him to take her
to the hospital. [Petitioner] initially agreed but then
changed his mind and instead got her some ice and some
Advil. [Petitioner] told her to lie down to "[l]et the
medicine kick in" and they both fell asleep.

Hours later, on the morning of 25 October 2007, Tiffany
heard someone knocking at the door. She immediately got
up and ran to the door. It was a sheriff's deputy.
Tiffany opened the door and told the deputy that her
husband had been beating her and to get her son out of
the house. Tiffany was later transported to the hospital
for treatment. She had a chipped front tooth and an
orbital fracture to her right eye that required surgery.
She was prescribed Vicodin for her pain and was out of
work for three months. Tiffany testified that she was
not using any drugs on the night in question.

Deputy Daniel Lauten of the Forsyth County Sheriff's
Office testified that on the morning of 25 October 2007
he responded to a call about a suspicious vehicle parked
in someone's driveway. Deputy Lauten ran the license
plate and the address of the registered owner came up to
an address on Asheby Road, in Belews Creek, North
Carolina. Deputy Lauten then went to the address and
rang the doorbell. He testified that Tiffany opened the
door and said, "Thank God you're here. He's going to
kill me." Deputy Lauten could tell that she had been
severely assaulted, as her lips and eyes were swollen.
Deputy Lauten then locked her in his patrol vehicle and
called for backup. When the backup officers arrived,
they searched the house and found Mike but did not find
[Petitioner]. Deputy Lauten searched for weapons in the
house and found one kitchen knife behind a night stand in

the bedroom and another kitchen knife between the cushions of the couch in the living room. Deputy Lauten also found a "crack pipe" on the night stand in the bedroom.

Sergeant Chuck Barhaam of the Forsyth County Sheriff's Office testified that on 25 October 2007 he responded to Deputy Lauten's call for backup and went inside the home to search for [Petitioner] and Mike. Sergeant Barhaam testified that they did not find [Petitioner] in the home but set up a perimeter in an effort to locate [him]. Deputies later found [Petitioner] hiding in a nearby residence which was under construction and took [him] into custody.

Corporal Amy Snider-Wells of the Forsyth County Sheriff's Office testified that Tiffany told her that she had a 50B domestic violence restraining order against [Petitioner] for two years but it had expired in August 2007. Corporal Snider-Wells interviewed [Petitioner] at the Forsyth County Sheriff's Office. [Petitioner] told Corporal Snider-Wells that he beat up his wife because she had another man in his home. [Petitioner] initially denied having sex with his wife, but then told Corporal Snider-Wells that they did have a sexual encounter, but it was consensual.

[Petitioner] testified in his own defense, stating that on 24 October 2007, he and Tiffany were not living together, but he was staying at his cousin's house up the street. [Petitioner] admitted that he was on probation and, as part of that probation, he was not supposed to be around Tiffany. [Petitioner] also admitted that as part of his probation he was on electronic house arrest, but he had violated his probation by cutting his electronic ankle bracelet off his leg. [Petitioner] testified that Tiffany called him around 9:30 p.m. on 24 October 2007 to ask if he would come over to their house with some cocaine. [Petitioner] stated that he arrived at their house around 11 p.m. and entered the back door using his key. [Petitioner] stated that he went to the bedroom and Tiffany was awake watching television. [Petitioner] testified that they snorted some of the cocaine that he brought and had oral sex and then intercourse. [Petitioner] stated that while they were having intercourse, he heard something downstairs. He went to the kitchen, got a knife, and looked around the rest of the house. [Petitioner] went back to the bedroom and asked Tiffany if anyone was in the house. [Petitioner] then noticed that the bag of cocaine which had been in his pants pocket was missing. [Petitioner] then asked

Tiffany about the cocaine but "she said she didn't know what I was talking about." [Petitioner] testified, "That's when I hit her, because I knew she was lying." [Petitioner] admitted to hitting Tiffany for "about a good five/eight minutes[,]" but claimed it was after they had intercourse. [Petitioner] stated that Tiffany asked him to take her to the hospital, but instead he gave her some ice and Advil, and they both fell asleep. [Petitioner] testified that the next thing he remembered was waking up and hearing the doorbell ringing. After [Petitioner] discovered that a deputy sheriff was at the door, he fled the house but was later found by deputies and taken into custody.

McCravey, 203 N.C. App. at 628-31, 692 S.E.2d at 412-14 (internal brackets and footnote omitted).

## III. Discussion

Federal courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court <u>only</u> on the ground that [the person] is in custody in violation of the <u>Constitution or laws or treaties of the United States</u>." 28 U.S.C. § 2254(a) (emphasis added). Further, "[b]efore a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).

When a petitioner has exhausted state remedies, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court

may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409-11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous"). Finally, this Court must presume state court findings of fact correct unless clear and convincing evidence rebuts them. 28 U.S.C. § 2254(e)(1).

## A.  Ground One

According to Ground One of the Petition, "the [t]rial court erred by given [sic] its opion [sic] that the alleged [d]rug use of the [victim] was not [r]elevant. . . . This act is a violation of due process of law." (Docket Entry 4, ¶ 12(Ground One).)

Respondent contends that, "although Petitioner raised the substance of this contention on direct appeal and in his PDR [Petition for Discretionary Review to the North Carolina Supreme Court], he did so almost exclusively in terms of a violation of state law." (Docket Entry 9 at 5 (citing Docket Entry 4-1 at 16-21 (pages 13 through 18 of Petitioner's brief on direct appeal to North Carolina Court of Appeals) and Docket Entry 4-3 at 15-18 (pages 13 through 16 of Petitioner's PDR brief)).)  In Respondent's view, "[b]ecause Petitioner's federal constitutional analysis presented to the state courts was so brief and fleeting, he did not fairly present [Ground One] to the state courts for adjudication."  (Id. at 7 (citing, inter alia, Mallory v. Smith, 27 F.3d 991, 994-95 (4th Cir. 1994)).)  Respondent further argues that, as a result, Petitioner failed to exhaust this claim, that a state law procedural bar, N.C. Gen. Stat. § 15A-1419(a)(3) and (b), would preclude subsequent litigation on point in the state courts, and that, pursuant to Breard v. Pruett, 134 F.3d 615 (4th Cir. 1998), the existence of that state-law procedural bar raises a procedural bar in this Court.  (Id. at 7-9.)  Upon review of Petitioner's state appellate filings, the Court concludes that, given the particular nature of the legal claim set forth in Ground One, Petitioner met his exhaustion obligation under Section 2254(b)(1) as to said claim.

Turning to the merits of that claim, the Court observes that the North Carolina Court of Appeals ruled, in pertinent part, as follows:

[Petitioner] challenges the trial court's statement, "This isn't about anybody's drug use," made in the following exchange during defense counsel's cross-examination of victim, Tiffany:

> Defense Counsel: Now, you said that last time you used marijuana was seven and a half years ago, is that right?
>
> Tiffany: Yes, about; yes.
>
> Defense Counsel: But you've used cocaine before as well, haven't you?
>
> Tiffany: No, I have not.
>
> The Court: Sustained. This is not about anybody's drug use.
>
> Defense Counsel: Can we approach the bench, Your Honor?
>
> The Court: No.
>
> Defense Counsel: So on the evening in question, there was no other use on your part of any drugs; is that right?
>
> Tiffany: No, I did not use any drugs.

Following the above exchange and out of the presence of the jury, defense counsel and the trial court had the following discussion about the trial court's comment:

> The Court: All right. Did you want to say anything about my not letting you ask her about the cocaine?
>
> Defense Counsel: Yes, Your Honor. For the record, I would be asking—I would ask her that and also followed up with a question of isn't it true that you failed the drug test in Guilford County that showed the presence of cocaine within the last two years, which under State versus Williams would go to her ability to see, hear and recall potentially as well as since I believe our offer of evidence later on will also relate to potential drug use that evening.

-9-

The Court:  Well, you can ask her—I let you ask all you wanted about her drug use that evening. So you're not saying that this drug test was close to that day?

Defense Counsel:  No, it's not.  Not within the time frame that would be something she would still be under the influence.  The only question, it may show a pattern wherein when she denies the fact that she had used it and then there is a—may have to admit that there was a positive screen for cocaine within a recent time period.  State versus Williams was a two-year range.  But I don't need to follow up any further.  I'll put it on in direct at that point.

The Court: Okay.  Well, State versus Williams is a very different case from this one; that one involved substantial mental health issues and—

Defense Counsel:  I think it involved a suicide question; yes.

The Court:  Yes. I mean, there is absolutely nothing to—

Defense Counsel:  They did indicate in State versus Williams that potential drug use would affect your ability to see, hear and recall, so . . .

The Court:  Well, that's not how I remember the facts of that case playing out, and it's extremely different from this.  One-time cocaine use in the last seven and a half years is not relevant to somebody's credibility. And this is not about her drug use. So . . .

Defense Counsel:  I wouldn't contend it was a one-time cocaine use, but it's also—it's not a credibility issue either.

The Court:  Well, what is it if it's not credibility?  What's it relevant to?

Defense Counsel:  Later evidence from the defense will indicate that there was some [drug use during] that evening which would be a pattern of the parties.  And clearly over

the objection of the defense, the State
brought out that [Petitioner] has used drugs
during the time period that they have been
involved together on a regular basis.

The Court: All right. Well, <u>I think we
allowed enough questions about that under Rule
404, it's certainly—I don't see that it's
relevant at all, but if it is it's marginal;
and substantial unfair prejudice involved.</u>

Defense Counsel: —Court's ruling.

The Court: All right. Anything else we need
to do in this?

Assistant District Attorney: Not for the
State, Your Honor.

The Court: All right. You all are excused
until 9:30 tomorrow morning.

<u>In context, the trial court's comment was a ruling by the
trial court as to the admissibility of evidence of
Tiffany's prior drug usage, specifically her failure of
a drug test at some time during the prior two years.</u>

. . .

<u>[Petitioner] contends that the trial court's statement
improperly influenced the jury to believe that "drug
usage was irrelevant and was very damaging to the
accused's theory of the case."</u>

<u>[Petitioner] argues that drug usage was very relevant to
his case as he contended that on the night in question,
he and Tiffany used cocaine together, then had consensual
intercourse, and after intercourse, he discovered his
cocaine missing and assaulted his wife. [Petitioner]
contends that the trial court improperly influenced
jury to believe that Tiffany's drug use was not relevant
to the case and undermined [Petitioner]'s theory before
the jury.</u>

The trial court's statement was made during defense
counsel's cross-examination of Tiffany. Based upon
[Petitioner]'s contentions as to the events of the
evening, Tiffany's use of cocaine on that night goes to
"the heart of the case," as it would support
[Petitioner]'s order of events, including the fact that
the intercourse with Tiffany was consensual. However,

the trial transcript shows that immediately following the trial court's statement—"This is not about anybody's drug use,"—the trial court permitted defense counsel to ask Tiffany whether she was using any drugs on the night of 24 October 2007. Allowing defense counsel to question Tiffany about her drug use on the night in question clearly demonstrated to the jury that Tiffany's drug use on that night was relevant and allowed [Petitioner] the opportunity to introduce evidence supporting his defense. In the context of the entire transcript, particularly [Petitioner]'s questioning of Tiffany regarding her drug use on the night of the incident and [Petitioner]'s later testimony regarding the same, the trial court's statement would not influence the jury to believe that Tiffany's drug use was "irrelevant." Furthermore, during the final charge to the jury, the trial court instructed:

> The law, as indeed it should, requires the presiding judge to be impartial. You should not draw any inference from a ruling I have made, expression on my face, inflection in my voice, or anything I've said or done that I have any opinion about any aspect of this case. It is your exclusive province to find the facts of this case and to render a verdict reflecting the truth as you find it.

> Therefore, given the "totality of the circumstances," the trial court's statement did not "reasonably have . . . a prejudicial effect on the result of the trial" and any error by the trial court is "considered harmless."

McCravey, 203 N.C. App. at 631-35, 692 S.E.2d at 414-16 (internal brackets and citations omitted) (emphasis added).

In light of the foregoing adjudication of the claim now presented in Ground One on the merits,[2] this Court may not grant

---

[2] "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 784-85 (2011); see also Richardson v. Branker, 668 F.3d 128, 144 n.19 (4th Cir. 2012) ("[A]ny doubts concerning the breadth of the [state] court's holding must be resolved in favor of the State."); Barbe v. McBride, 521 F.3d 443, 456 n.19 (4th Cir. 2008) ("[I]t was not necessary . . . for the state circuit court to consider [specific United States Supreme Court] decisions (or any other applicable federal precedent) in order to refrain from an unreasonable application of federal law. . . . And, in assessing the [federal] claim, the
(continued...)

-12-

habeas relief thereon unless Petitioner satisfies his heavy burden under Section 2254(d).  See Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011).  Additionally, a petitioner cannot receive habeas relief from a trial-type error of the sort at issue here unless the "error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 622 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); see also Cooper v. Taylor, 103 F.3d 366, 371 (4th Cir. 1996) (en banc) ("As the court in Brecht admonished, habeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice."'  The verdict must have been affected." (internal citation and emphasis omitted) (quoting Brecht, 507 U.S. at 637)).  For some time after the enactment of Section 2254(d), "a somewhat convoluted debate [arose] over the appropriate standard in harmless error habeas cases . . . [which the United States Supreme Court resolved in Fry v. Pliler, 551 U.S. 112 (2007), by holding that] [f]ederal habeas courts must always review constitutional errors in state trials under Brecht, but they need not debate whether a state court's harmless error determination also unreasonably applied [the harmlessness standard for direct appeals recognized in Chapman v. California, 386 U.S. 18 (1967)] . . . ."  Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011).

---

        ²(...continued)
[state] circuit court was entitled to look to, for example, the state authorities cited by [the petitioner]."); Hill v. Ozmint, 339 F.3d 187, 196 (4th Cir. 2003) (rejecting "conten[tion] that, because the state court referenced only state law in resolving [a federal] claim, it failed to 'adjudicate' it 'on the merits'").

Put another way:

> [M]ost successful habeas petitioners must still . . . demonstrat[e] [1] that the state court's resolution of their constitutional *claim* was contrary to or unreasonably applied clearly established federal law **and** [2] that the error was prejudicial under <u>Brecht</u>. But this two-step process does not require [the federal court] to address the first prong where the petitioner's claims fail on the second, and . . . <u>Fry</u> absolves [the federal court] of any need to consider both [Section 2254(d)]/<u>Chapman</u> unreasonableness and <u>Brecht</u> prejudice in the harmless error context. Accordingly, [the Court] need only determine whether the [asserted trial error] prejudiced [Petitioner] under the <u>Brecht</u> standard.

<u>Id.</u> (italics in original) (bold added). As detailed above, the North Carolina Court of Appeals found that the trial court's challenged statement, read in context and given the state of the entire record, represented at most non-prejudicial error (i.e., any error did not affect the verdict). Upon careful review of the record, this Court independently reaches the same conclusion for the reasons well-expressed by the North Carolina Court of Appeals. Ground One therefore fails as a matter of law under <u>Brecht</u>.[3]

---

[3] In his Memorandum opposing Respondent's summary judgment motion, Petitioner articulated a different claim related to the subject of the victim's alleged drug use; specifically, he argued: "The [victim] testified under oath that she haven't [sic] used drugs in 7 years but [she] tested positive for cocaine 2 years prior to her testimony. If the jury could have been shown the lies by proof of perjury, [] [P]etitioner's defense could've had a effect on the jury to conclude that [the victim] could be lieing [sic] about the events that lead [sic] up to the assault. This is positive testimony for the defense that was withheld unconstitutionally." (Docket Entry 10 at 2.) This argument affords no basis for relief. As an initial matter, "[o]rdinarily, a response to a motion for summary judgment is not the proper vehicle to raise new claims and, when a habeas petitioner has not moved to amend his petition, the Court will not consider any allegations or arguments stemming from this new claim." <u>White v. Keller</u>, No. 1:10CV841, 2013 WL 791008, at *3 (M.D.N.C. Mar. 4, 2013) (unpublished) (internal brackets and quotation marks omitted) (collecting cases). Further, North Carolina law "provides that 'specific instances of the conduct of a witness, for the purpose of attacking or supporting his [or her] credibility, other than conviction of crime as provided in [North Carolina] Rule [of Evidence] 609, may not be proved by extrinsic evidence.'" <u>State v. Cook</u>, 165 N.C. App. 630, 636, 599 S.E.2d 67, 72 (2004) (internal brackets and emphasis omitted)
(continued...)

## **B.  Ground Two**

Next, the Petition alleges that Petitioner "was put in Double jepordy [sic] by the term 'use of force or threat of serious violence,' [f]or a consential [sic] [a]ct, and sentence [sic] to [an] unconstitutional [l]ifetime SBM statute." (Docket Entry 4, ¶ 12(Ground Two).)  As "[s]upporting facts" for this claim, the Petition states:  "It was testified to by [the victim] that she didn't have a problem with the sex, it was more about the fight they had.  The unsupported charge cause [sic] the judge to aggravate and double jeopardized a unconstitutional life time statute 'SBM' to punish [Petitioner] twice at the conclusion of all the states [sic] evidence which was contrary to conviction." (Id., ¶ 12(Ground Two)(a) (internal citation omitted).)  In opposing summary judgment, Petitioner elaborated that the SBM statute "doesn't apply to [him] for several reasons[:]  1) as argued previously the term 'use of force' in [sic] too vague to fit the instant case, 2) [P]etitioner showed through the [victim's] own testimony that there wasn't any force during the commission of sex with [Petitioner]."  (Docket Entry 10 at 3; see also id. (asserting that victim "stated that she never had a problem with the sex" and

---

³(...continued)
(quoting North Carolina Rule of Evidence 608(b)).  North Carolina law thus prohibited Petitioner from impeaching the victim by presenting evidence that, contrary to her averment of abstention from drug use for seven years, she tested positive for drugs within two years of her testimony.  Such evidentiary prohibitions exist "to focus the fact-finder on the most important facts and conserve judicial resources by avoiding mini-trials on collateral issues.  These are good reasons for limiting the use of extrinsic evidence and . . . [t]he constitutional propriety of [such] rule[s] cannot be seriously disputed." Nevada v. Jackson, ___ U.S. ___, ___, 133 S. Ct. 1990, 1993 (2013) (internal brackets, citations, and quotation marks omitted).

claiming that "the element of force in [sic] lacking and these two incidents [the assault and the sex] were completely separate").)

On direct appeal, Petitioner presented the same basic challenge (but without invoking double jeopardy principles) (see Docket Entry 4-1 at 21-28),[4] which the North Carolina Court Appeals rejected as follows:

> [Petitioner] contends that the statutory definition of "aggravated offense" in N.C. Gen. Stat. § 14-208.6(1a) [which provides for SBM] is unconstitutionally vague because it does not specify what constitutes "use of force."
>
>> It is settled law that a statute may be void for vagueness and uncertainty. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. Even so, impossible standards of statutory clarity are not required by the constitution. When the language of a statute provides an adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges and juries to interpret and administer it uniformly, constitutional requirements are fully met.
>
> In re Burrus, 275 N.C. 517, 531, 169 S.E.2d 879, 888 (1969) (citations and quotation marks omitted). "Statutory language should not be declared void for vagueness unless it is not susceptible to reasonable

---

[4] In the above-cited appeal brief, Petitioner specifically asserted that North Carolina's SBM statute's "definition [of qualifying offenses] is void for vagueness in violation of the Due Process Clause, 14th Amdt. U.S. Constitution, and the Law of the Land Clause, Art. I, Sec. 19, N.C. Constitution" (Docket Entry 4-1 at 25), quoted at length from North Carolina case law recognizing that "'[t]he United States Supreme Court and the North Carolina Supreme Court have adopted similar tests for determining whether a statute is unconstitutionally vague'" (id. (quoting Malloy v. Cooper, 162 N.C. App. 504, 507, 592 S.E.2d 17, 20, appeal dismissed, 358 N.C. 376, 597 S.E.2d 133 (2004))), and argued that "the testimony was that [the victim] was fully cooperative with the acts, and the acts were not done with force . . . such that the crime for which [Petitioner] was convicted was not an aggravated offense [under the SBM statute]" (id. at 28 (internal block quotation format and quotation marks omitted)).

-16-

understanding and interpretation. Mere differences of opinion as to a statute's applicability do not render it unconstitutionally vague." Rhyne v. K-Mart Corp., 358 N.C. 160, 187, 594 S.E.2d 1, 19 (2004) (citations omitted). We apply the rules of statutory interpretation to discern the meaning of N.C. Gen. Stat. § 14-208.6(1a). Id.

"Statutory interpretation begins with the cardinal principle of statutory construction that the intent of the legislature is controlling. In ascertaining the legislative intent, courts should consider the language of the statute, the spirit of the statute, and what it seeks to accomplish." Benton v. Hanford, 195 N.C. App. 88, 92, 671 S.E.2d 31, 34 (2009) (citation and quotation marks omitted). "Where the statutory language is clear and unambiguous, the [c]ourt does not engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language." In re Nantz, 177 N.C. App. 33, 40, 627 S.E.2d 665, 670 (2006) (citation and quotation marks omitted). "If the language is ambiguous or unclear, the reviewing court must construe the statute in an attempt not to defeat or impair the object of the statute if that can reasonably be done without doing violence to the legislative language." Arnold v. City of Asheville, 186 N.C. App. 542, 548, 652 S.E.2d 40, 46 (2007) (citations and quotation marks omitted).

> In so doing, a court may look to other indicia of legislative will, including: the purposes appearing from the statute taken as a whole, the phraseology, the words ordinary or technical, the law as it prevailed before the statute, the mischief to be remedied, the remedy, the end to be accomplished, statutes in pari materia, the preamble, the title, and other like means. Statutory provisions must be read in context, and those dealing with the same subject matter must be construed in pari materia, as together constituting one law, and harmonized to give effect to each.

Trayford v. N.C. Psychology Bd., 174 N.C. App. 118, 123, 619 S.E.2d 862, 865 (2005).

[Petitioner] argues that "use of force" is a "term of art" and the statute does not specify whether it means "deadly force, excessive force, unreasonable force, de minimis force, or reasonable force." The plain language of N.C. Gen. Stat. § 14-208.6(1a) does not specify what

-17-

type of force is required, and Article 27A of Chapter 14 of the General Statutes does not specifically define what type of force N.C. Gen. Stat. § 14-208.6(1a) is referencing or provide for any further definition of force. However, if we consider the context of the definition of "aggravated offense" stated in N.C. Gen. Stat. § 14-208.6(1a), the meaning of "use of force" becomes clear. First, we note that to be subject to SBM, a defendant must have a "reportable conviction" as defined by N.C. Gen. Stat. § 14-208.6(4). Pursuant to N.C. Gen. Stat. § 14-208.6(4), a "reportable conviction" includes conviction of "a sexually violent offense." N.C. Gen. Stat. § 14-208.6(5) states that a "sexually violent offense" includes second degree rape pursuant to N.C. Gen. Stat. § 14-27.3. Thus, second-degree rape is a "reportable conviction." See N.C. Gen. Stat. §§ 14-208.6(4) and 14-208.6(5). Only a "reportable conviction" can be an "aggravated offense" as defined by N.C. Gen. Stat. § 14-208.6(1a). We therefore look to N.C. Gen. Stat. § 14-27.3, which defines second-degree rape, to determine if this crime is an "aggravated offense." See State v. Davison, --- N.C. App. ----, ----, 689 S.E.2d 510, 517 (2009) (The determination of whether an offense is an "aggravated offense" pursuant to N.C. Gen. Stat. § 14-208.40A is based solely upon "the elements of the offense of which a defendant was convicted and not the underlying factual scenario giving rise to the conviction."). Second-degree rape pursuant to N.C. Gen. Stat. § 14-27.3 (2007) includes the element that the criminal offense be committed "by force and against the will of the other person." We note that N.C. Gen. Stat. § 14-27.3, like N.C. Gen. Stat. § 14-208.6(1a), does not include a definition of "force," but the force required in a sexual offense of this nature has been well-defined by case law.

Sexual offenses such as first-degree rape pursuant to N.C. Gen. Stat. § 14-27.2 (2007), second-degree rape pursuant to N.C. Gen. Stat. § 14-27.3, first-degree sexual offense pursuant to N.C. Gen. Stat. § 14-27.4 (2007), and second-degree sex offense pursuant to N.C. Gen. Stat. § 14-27.5 (2007), all include the element that the criminal offense be committed "by force and against the will of the other person." In the context of the above-enumerated sexual offenses, our Supreme Court has determined that the statutory phrase, "by force and against the will of the other person," means the same as it did at common law. State v. Locklear, 304 N.C. 534, 539, 284 S.E.2d 500, 503 (1981). Our [c]ourts have further defined the element of force in these sexual offenses by stating that "the requisite force may be

established either by actual physical force or by constructive force in the form of fear, fright, or coercion. 'Physical force' means force applied to the body." State v. Scott, 323 N.C. 350, 354, 372 S.E.2d 572, 575 (1988) (citations omitted). "Constructive force is demonstrated by proof of threats or other actions by the defendant which compel the victim's submission to sexual acts. Threats need not be explicit so long as the totality of circumstances allows a reasonable inference that such compulsion was the unspoken purpose of the threat." State v. Hardy, 104 N.C. App. 226, 231, 409 S.E.2d 96, 98-99 (1991) (citations and quotation marks omitted). The language of N.C. Gen. Stat. § 14-208.6(1a)—"through the *use of force* or the threat of serious violence"—reflects the established definitions as set forth in case law of both physical force and constructive force, in the context of the sexual offenses enumerated in N.C. Gen. Stat. §§ 14-27.2, 14-27.3, 14-27.4, and 14-27.5. (emphasis added).

The legislature intended that the same definition of force, as has been traditionally used for second-degree rape, to apply to the determination under N.C. Gen. Stat. § 14-208.6(1a) that an offense was committed by "the use of force or the threat of serious violence." Given the similarity in the language describing the use of force as to the above-referenced criminal sexual offenses and the Legislature's use of the phrase "through the use of force or the threat of serious violence" in the statutory definition of "aggravated offense" in N.C. Gen. Stat. § 14-208.6(1a), a defendant would adequately be warned as to the conduct that would fall into the definition of an "aggravated offense" which could subject him to SBM. Burrus, 275 N.C. at 531, 169 S.E.2d at 888. Therefore, we hold that the definition of "aggravated offense" in N.C. Gen. Stat. § 14-208.6(1a) is not unconstitutionally vague.

[Petitioner] further argues that even if the Court does not find that the statute is void for vagueness, the particular facts of this case do not constitute an "aggravated offense" pursuant to N.C. Gen. Stat. § 14-208.6(1a). However, as stated above, [Petitioner's] argument has been rejected by this Court in Davison, 201 N.C. App. at ----, 689 S.E.2d at 517 ("[W]hen making a determination pursuant to N.C.G.S. § 14-208.40A, the trial court is only to consider the elements of the offense of which a defendant was convicted and is not to consider the underlying factual scenario giving rise to the conviction."). Here, [Petitioner] was convicted of second-degree rape. The essential elements of

second-degree rape include vaginal intercourse "[b]y force and against the will of the other person." N.C. Gen. Stat. § 14-27.3(a)(1). [Petitioner] does not contend that he did not have intercourse with Tiffany, but only that this act was not "by force and against" her will. The jury rejected [Petitioner's] contention that the intercourse was consensual and found that it was "by force and against" Tiffany's will by finding him guilty of second-degree rape. As the essential elements of second-degree rape are covered by the plain language of "aggravated offense" as defined by N.C. Gen. Stat. § 14-208.6(1a), we hold that second-degree rape is an "aggravated offense" and the trial court did not err in ordering [Petitioner] to lifetime SBM pursuant to N.C. Gen. Stat. § 14-208.40A.

McCravey, 203 N.C. App. at 638-41, 692 S.E.2d at 418-20 (internal brackets and ellipses omitted).

Because the North Carolina Court of Appeals denied on the merits any Due Process Clause-based vagueness or insufficient evidence challenge(s) by Petitioner related to the SBM issue,[5] this Court may not grant habeas relief on such bases unless he satisfies Section 2254(d). See Cullen, ___ U.S. at ___, 131 S. Ct. at 1398. Petitioner, however, has failed to carry his heavy burden under

---

[5] "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 784-85 (2011); see also Richardson v. Branker, 668 F.3d 128, 144 n.19 (4th Cir. 2012) ("[A]ny doubts concerning the breadth of the [state] court's holding must be resolved in favor of the State."); Barbe v. McBride, 521 F.3d 443, 456 n.19 (4th Cir. 2008) ("[I]t was not necessary . . . for the state circuit court to consider [specific United States Supreme Court] decisions (or any other applicable federal precedent) in order to refrain from an unreasonable application of federal law. . . . And, in assessing the [federal] claim, the [state] circuit court was entitled to look to, for example, the state authorities cited by [the petitioner]."); Hill v. Ozmint, 339 F.3d 187, 196 (4th Cir. 2003) (rejecting "conten[tion] that, because the state court referenced only state law in resolving [a] claim, it failed to 'adjudicate' it 'on the merits'"). Moreover, the language from In re Burrus quoted by the North Carolina Court of Appeals in denying Petitioner's instant claim(s), see McCravey, 203 N.C. App. at 6, 692 S.E.2d at 4, relies on (and, in fact, parrots) the federal constitutional standard established by United States Supreme Court decisions, see In re Burrus, 275 N.C. at 531, 169 S.E.2d at 888 (citing Cramp v. Board of Pub. Instruction, 368 U.S. 278 (1961), and United States v. Petrillo, 332 U.S. 1 (1947)).

Section 2254(d) of showing that the above-quoted state court ruling _either_ conflicts with/unreasonably applies federal law (as construed by the United States Supreme Court) _or_ rests upon an unreasonable determination of the facts from the record evidence. To the contrary, in the face of the North Carolina Court of Appeals's convincing demonstration that the SBM statute afforded Petitioner constitutionally-valid notice and that the jury properly found him guilty of second-degree rape (resulting, by operation of state law, in application of the SBM statute to him), Petitioner fails _either_ to cite any United States Supreme Court precedent mandating a different result _or_ to identify any unreasonable state court fact-finding. (_See_ Docket Entry 4, ¶ 12(Ground Two)(a); Docket Entry 10 at 3.)[6] The Due Process Clause-based aspects of Ground Two of the Petition thus fall short under Section 2254(d).

Finally, to the extent Ground Two of the Petition sets forth a claim under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution (made applicable to the States via the Fourteenth Amendment, _see_ Benton v. Maryland, 395 U.S. 784, 794 (1969)), that claim fails as unexhausted and procedurally barred because: 1) Petitioner did not present it to the state courts

---

[6] Given the quality of the state appellate decision-making on these points and the deferential nature of the review under Section 2254(d), no need exists for further discussion; however, the Court feels compelled to note that the record flatly contradicts Petitioner's assertion that the victim testified "she didn't have a problem with the sex" (Docket Entry 4, ¶ 12(Ground Two)(a) (citing Docket Entry 9-7 at 2, 5-7 (trial transcript pages 162 and 165 through 167)).) More pointedly, the pages of the record cited by Petitioner and adjacent portions of the victim's testimony clearly reflect that Petitioner used the credible threat of further violence of the sort he already had inflicted upon the victim that evening (or worse) to accomplish his criminal sexual objectives over her explicit objections. (_See_ Docket Entry 9-7 at 1-8.)

(Docket Entry 4, ¶ 10 (acknowledging that Petitioner sought no collateral relief in state courts); Docket Entry 4-1 at 21-28 (setting out Petitioner's direct appeal argument regarding SBM without any reference to Double Jeopardy Clause or related principles)); and 2) now would lack the ability to do so, see Rose v. Lee, 252 F.3d 676, 683 (4th Cir. 2001) (discussing mandatory nature of procedural bar under N.C. Gen. Stat. § 15A-1419, which applies, inter alia, to collateral claims regarding matters the petitioner could have litigated on direct appeal); Breard, 134 F.3d at 619 (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991), for proposition that "procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred'"). In light of the procedural bar, Petitioner must demonstrate either that cause for and prejudice from his procedural default exists or that the refusal to address this claim will result in a miscarriage of justice. Longworth v. Ozmint, 377 F.3d 437, 447-48 (4th Cir. 2004). He has made no argument on these points and no reason to excuse the default appears in the record.

Alternatively, Petitioner's SBM-related claim premised on double jeopardy principles lacks merit, because "the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, in common parlance, be described as punishment. The Clause protects only against the imposition of multiple criminal punishments for the same offense and then only

when such occurs in successive proceedings." <u>Hudson v. United States</u>, 522 U.S. 93, 98-99 (1997) (internal citations and quotation marks omitted).  Assuming that SBM constituted criminal punishment under the Double Jeopardy Clause, <u>but see</u> <u>Lavandera-Hernandez v. Terrell</u>, No. 1:12CV553, 2013 WL 1314721, at *7 (M.D.N.C. Mar. 28, 2013) (unpublished) (describing lifetime SBM as "appropriate civil regulatory measure designed to protect the public" that did not "implicate[] due process or Eighth Amendment concerns when properly imposed" (citing <u>State v. Bowditch</u>, 364 N.C. 335, 700 S.E.2d 1 (2010))), <u>appeal dismissed</u>, 539 F. App'x 159 (4th Cir. 2013), Petitioner received SBM in connection with his sentencing (not via a successive proceeding), as confirmed by the fact that he agreed (through his attorney) that the trial court could amend the second-degree rape judgment to provide for SBM one day after the jury verdict and the imposition of a prison term (<u>see</u> Docket Entry 9-11 at 10-11).  In sum, any Double Jeopardy Clause-based claim by Petitioner regarding SBM fails both procedurally and substantively.

## IV.  Conclusion

Petitioner has not shown a valid basis for habeas relief.

**IT IS THEREFORE ORDERED** that Respondent's Motion for Summary Judgment (Docket Entry 7) is **GRANTED,** the Petition (Docket Entry 4) is **DENIED,** and a Judgment be entered **DISMISSING** this action.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 2, 2014